1
2
3
4
5
6
7

8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    JERAMIAH RAY PENDER,                    No.  2:21-CV-0938-DMC

12                Plaintiff,

13          v.                                MEMORANDUM OPINION AND ORDER

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                   Defendant.
16

17

18                Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, ECF Nos. 7 and 8, this case is before the

21    undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28

22    U.S.C. § 636(c); see also ECF No. 12 (minute order referring matter to Magistrate Judge).

23    Pending before the Court are the parties' briefs on the merits, ECF Nos. 14 and 15.

24                The Court reviews the Commissioner's final decision to determine whether it is:

25    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

26    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

27    more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

28    (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

1 a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

2 including both the evidence that supports and detracts from the Commissioner's conclusion, must

3 be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

4 v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's

5 decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

6 Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

7 findings, or if there is conflicting evidence supporting a particular finding, the finding of the

8 Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

9 Therefore, where the evidence is susceptible to more than one rational interpretation, one of

10 which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

11 Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

12 standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

13 Cir. 1988).

14 For the reasons discussed below, the matter will be remanded for further

15 proceedings.

16

17 **I.  THE DISABILITY EVALUATION PROCESS**

18 To achieve uniformity of decisions, the Commissioner employs a five-step

19 sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§

20 404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

21
22 Step 1     Determination whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied;

23
24 Step 2     If the claimant is not engaged in substantial gainful activity, determination whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied;
25

26 Step 3     If the claimant has one or more severe impairments, determination whether any such severe impairment meets or medically equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the claim is granted;
27

28

2

| | | |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(A).  The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).  The claimant has the initial burden of proving the existence of a disability.  See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work.  See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

3

## II.  THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on February 8, 2019.  See CAR 16.[1]

Plaintiff claims disability began on February 29, 2019.  See id.  Plaintiff's claim was initially

denied.  Following denial of reconsideration, Plaintiff requested an administrative hearing, which

was held on October 1, 2020, before Administrative Law Judge (ALJ) Lawrence Duran.  In an

October 21, 2020, decision, the ALJ concluded plaintiff is not disabled based on the following

relevant findings:

1. The claimant has the following severe impairment(s): left calcaneus fracture, status post open reduction and internal fixation surgery; major depressive disorder; post-traumatic stress disorder; and anxiety;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: the claimant can perform medium work; the claimant is able to lift/carry 50 pounds occasionally and 25 pounds frequently; the claimant can stand/walk for 4 hours in an 8-hour day; sit for 6 hours in an 8-hour day; the claimant can frequently climb, stoop, kneel, crouch, and crawl, but is unable to operate foot controls with his left foot; he is unable to perform any fast-paced work or intensely concentrate for greater than 30 minutes without a 5-minute change in focus; he is limited to occasional interaction with coworkers and supervisors and is to have no interaction with the public; he may be absent or off task 5% of the time due to foot pain and mental distractions;

4. Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, the claimant is able to perform his past relevant work and there are jobs that exist in significant numbers in the national economy that the claimant can perform.

See id. at 19-28.

After the Appeals Council declined review on April 19, 2021, this appeal followed.

/ / /

/ / /

/ / /

---

[1]    Citations are to the Certified Administrative Record (CAR) lodged on December 13, 2021, ECF No. 11.

### III. DISCUSSION

In his opening brief, Plaintiff argues: (1) the ALJ failed to provide specific, clear, and convincing reasons for discounting Plaintiff's allegations concerning mental limitations; (2) the ALJ failed to explain his departure from the opinions of the agency mental health consultants; (3) the ALJ failed to account for deficits in attention and memory in hypotheticals posed to the vocational expert; (4) the ALJ failed to provide germane reasons for discounting third-party lay witness evidence from Plaintiff's friend Laura Chambard; (5) Plaintiff's past work as a computer peripheral equipment operate did not constitute substantial gainful activity; and (6) the ALJ failed to resolve apparent inconsistencies between the vocational expert's testimony and the definitions in the Dictionary of Occupational Titles.

### A.   <u>Medical Opinions</u>

"The ALJ must consider all medical opinion evidence." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  The ALJ errs by not explicitly rejecting a medical opinion.  <u>See Garrison v. Colvin</u>, 759 F.3d 995, 1012 (9th Cir. 2014).  The ALJ also errs by failing to set forth sufficient reasons for crediting one medical opinion over another.  <u>See id.</u>

Under the regulations, only "licensed physicians and certain qualified specialists" are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); <u>see also</u> <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012).  Where the acceptable medical source opinion is based on an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it rests on his own independent examination of the claimant." <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).  The opinions of non-examining professionals may also constitute substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.  <u>See Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002).  Social workers are not considered an acceptable medical source.  <u>See Turner v. Comm'r of Soc. Sec. Admin.</u>, 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Nurse practitioners and physician assistants also are not acceptable medical sources.  <u>See Dale v. Colvin</u>, 823 F.3d 941, 943 (9th Cir. 2016). Opinions from "other sources" such as nurse practitioners, physician assistants, and social

1    workers may be discounted provided the ALJ provides reasons germane to each source for doing

2    so.  See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874

3    F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance

4    when opinions from "other sources" may be considered acceptable medical opinions).

5            The Commissioner has promulgated revised regulations concerning how ALJs

6    must evaluate medical opinions for claims filed, as here, on or after March 27, 2017.  See 20

7    C.F.R. §§ 404.1520c, 416.920c.  These regulations supersede prior caselaw establishing the

8    treating physician rule which established a hierarchy of weight to be given medical opinions

9    depending on their source.  See id.; see also Jones v. Saul, 2021 WL 620475, at *9 (E.D. Cal.

10   Feb. 17, 2021) ("In sum, because (1) the 2017 regulations are not arbitrary and capricious or

11   manifestly contrary to statute, (2) the prior judicial construction was not mandated by the

12   governing statutory language to the exclusion of a differing agency interpretation, and (3) the

13   [treating-physician rule] is inconsistent with the new regulation, the court concludes that the 2017

14   regulations effectively displace or override [prior caselaw.]").  Thus, ALJs are no longer required

15   to "defer to or give any specific evidentiary weight to" treating physicians over medical opinions

16   from other sources.  See Carr v. Comm'r of Soc. Sec., 2021 WL 1721692, at *7 (E.D. Cal. Apr.

17   30, 2021).

18           Under the revised regulations, the ALJ must evaluate opinions and prior

19   administrative medical findings by considering their "persuasiveness."  See Buethe v. Comm'r of

20   Soc. Sec., 2021 WL 1966202, at *3 (E.D. Cal, May 17, 2021) (citing 20 C.F.R. § 404.1520c(a)).

21   In determining how persuasive the opinion of a medical source is, an ALJ must consider the

22   following factors:  supportability, consistency, treatment relationship, specialization, and "other

23   factors."  See Buethe, 2021 WL 1966202, at *3 (citing § 404.1520c(b), (c)(1)-(5)).  Despite a

24   requirement to consider all factors, the ALJ's duty to articulate a rationale for each factor varies.

25   See Buethe, 2021 WL 1966202, at *3 (citing § 404.1520c(a)-(b)).

26   / / /

27   / / /

28   / / /

6

1      Specifically, in all cases the ALJ must at least "explain how [she] considered the

2  supportability and consistency factors," as they are "the most important factors." See Buethe,

3  2021 WL 1966202, at *4 (citing § 404.1520c(b)(2)).  For supportability, the regulations state:

4  "[t]he more relevant the objective medical evidence and supporting explanations presented by a

5  medical source are to support his or her medical opinion(s) or prior administrative medical

6  finding(s), the more persuasive [the opinion] will be."  See Buethe, 2021 WL 1966202, at *4

7  (quoting § 404.1520c(c)(1)).  "For consistency, the regulations state: '[t]he more consistent a

8  medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

9  medical sources and nonmedical sources in the claim, the more persuasive [the opinion] will be.'"

10  Buethe, 2021 WL 1966202, at *4 (quoting § 404.1520c(c)(2)).  "The ALJ is required to articulate

11  findings on the remaining factors (relationship with claimant, specialization, and 'other') only

12  when 'two or more medical opinions or prior administrative medical findings about the same

13  issue' are 'not exactly the same,' and both are 'equally well-supported [and] consistent with the

14  record.'"  Buethe, 2021 WL 1966202, at *4 (quoting § 404.1520c(b)(2) & (3)).

15      At Step 4, the ALJ considered the medical opinion evidence in formulating

16  Plaintiff's residual functional capacity.  See CAR 24-25.  Specifically, the ALJ noted the opinions

17  of state agency consultants, Drs. Acinas and Linder, who provided opinions regarding physical

18  capacity, and Drs. Stephenson and Collado, who provided opinions regarding mental capacity.

19  See id.  The ALJ stated:

20          The State Agency medical consultants issued opinions regarding the
            claimant's ability to perform work-related activities. Drs. Acinas and
21          Linder opined that the claimant has the ability to perform light work tasks
            that involve frequent balancing, stooping, kneeling, crouching and
22          crawling and occasional climbing of ramps, stairs, ladders, ropes and
            scaffolds, but should sit for 2 minutes every 2 hours to alleviate left lower
23          extremity pain (Ex. 1A & 5A). As to his mental impairments, Drs.
            Stephenson and Collado noted that the claimant is capable of simple 1-2
24          step tasks for 8 hours per day/40 hours per week albeit with limited public
            interaction (Ex. 1A & 5A).
25
            As for medical opinions and prior administrative medical findings, we will
26          not defer or give any specific evidentiary weight, including controlling
            weight, to any prior administrative medical findings or medical opinions,
27          including those from your medical sources. We fully considered the
            medical opinions and prior administrative medical findings in your case.
28

7

In determining the claimant's residual functional capacity, the opinions of Drs. Acinas and Linder (Ex. 1A & 5A) are found partially persuasive as to the claimant's physical limitations. However, the objective and examination findings of record and the claimant's good recovery from surgery supports less exertional limitation. By his own admission, the claimant reported that he walks 2-3 miles a day and that physical conditions do not primarily restrict him. The opinions of Drs. Stephenson and Collado (Ex. 1A & 5A), as they pertain to the claimant's psychiatric impairments, are found persuasive, as they show consistency with the record and are supported by examination findings and by the claimant's activities of daily living. . . .

CAR 24-25.

Plaintiff argues the ALJ erred by accepting mental limitations opined by Drs. Stephenson and Collado yet failing to include such limitations in Plaintiff's residual functional capacity. See ECF No. 14, pgs. 19-21. According to Plaintiff:

On May 7, 2019, a State agency psychologist, Mack Stephenson, Ph.D., opined that Plaintiff should be restricted to simple 1-2 step tasks with limited public interaction (Tr. 81). On June 4, 2019, a State agency psychiatrist, J. Collado, M.D., concurred (Tr. 106).
The ALJ found that the State agency mental health consultants' opinions were persuasive, supported, and consistent with the record evidence (Tr. 25). Despite finding these medical source opinions persuasive, the ALJ did not include a restriction in Plaintiff's residual functional capacity (RFC) limiting him to simple 1 to 2 step tasks (Tr. 21). Rather, the ALJ found that Plaintiff could perform work that was not fast-paced so long as he would not need to "intensely concentrate" for more than 30 minutes without a 5-minute change in focus (Tr. 20). Additionally, the ALJ limited Plaintiff to occasional interaction with coworkers and supervisors, no interaction with the public, and provided that Plaintiff would be absent or off task 5% of the time (Tr. 20).
The ALJ formulated a residual functional capacity that materially departed from the State agency psychologists' opinions. The omission of a limitation to simple "1 to 2 step tasks" is not immaterial. In *Rounds v. Comm'r of Soc. Sec.*, the Ninth Circuit found that an individual restricted to 1 to 2 step tasks could not perform occupations requiring a *Dictionary of Occupational Titles* (DOT) reasoning level of 2. *See Rounds v. Comm'r of Soc. Sec.*, 807 F.3d 996, 1003 (9th Cir. 2015) ("There was an apparent conflict between Rounds' RFC, which limits her to performing one- and two-step tasks, and the demands of Level Two reasoning, which requires a person to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.""").
The ALJ's failure to explain his rationale for departing from the opinions of the State agency psychologists constituted clear legal error. *See* SSR 96-8p ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *Burkett v. Saul*, 806 Fed. Appx. 509, 511 (9th Cir. Mar. 6,

/ / /

/ / /

8

1    2020) ("An ALJ may reject the opinion of nonexamining physicians so
2    long as the ALJ references specific evidence in the medical record' that
     supports doing so") (internal citation omitted).

3    ECF No. 14, pgs. 19-20.

4    Here, the ALJ observed that "Drs. Stephenson and Collado noted that the claimant

5    is capable of simple 1-2 step tasks for 8 hours per day/40 hours per week. . . ." CAR 24.  The

6    ALJ also stated: "The opinions of Drs. Stephenson and Collado (Ex. 1A & 5A), as they pertain

7    to the claimant's psychiatric impairments, are found persuasive, as they show consistency with

8    the record and are supported by examination findings and by the claimant's activities of daily

9    living. . . ." Id. at 25.  In describing Plaintiff's mental residual functional capacity, the ALJ found

10   that Plaintiff ". . .is unable to perform any fast-paced work or intensely concentrate for greater

11   than 30 minutes without a 5-minute change in focus; he is limited to occasional interaction with

12   coworkers and supervisors and is to have no interaction with the public; he may be absent or off

13   task 5% of the time due to foot pain and mental distractions." Id. at 21.

14   The Court finds that the ALJ did not reject any opinions offered by Drs.

15   Stephenson and Collado.  To the contrary, the ALJ's mental residual functional capacity

16   assessment captures the mental limitations opined by these doctors, including a limiting to 1-2

17   step tasks.  In particular, the ALJ determined that Plaintiff cannot perform fast-paced work or

18   work requiring intense concentration.  The ALJ also acknowledged the doctors' opinions by

19   indicating that Plaintiff would need to frequently change focus and that Plaintiff would be off task

20   due to mental distractions.  Moreover, as Defendant notes, the vocational expert in this case

21   testified that someone with the mental residua capacity described by the ALJ could perform the

22   job of housekeeping cleaner, which requires only reasoning skill level 1, which is consistent with

23   simple 1-2 step tasks according to the Dictionary of Occupational Titles.

     **B.    Plaintiff's Statements and Testimony**

25   The Commissioner determines the weight to be given to a claimant's own

26   statements and testimony, and the Court defers to the Commissioner's discretion if the

27   Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94

28   F.3d 520, 522 (9th Cir. 1996).  An explicit finding must be supported by specific, cogent reasons.

9

1  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.

2  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify

3  what testimony is not afforded weight and what evidence undermines the testimony.  See id.

4  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's

5  reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also

6  Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue,

7  504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

8         If there is objective medical evidence of an underlying impairment, the

9  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

10  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

11  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

12           The claimant need not produce objective medical evidence of the
             [symptom] itself, or the severity thereof.  Nor must the claimant produce
13           objective medical evidence of the causal relationship between the
             medically determinable impairment and the symptom.  By requiring that
14           the medical impairment "could reasonably be expected to produce" pain or
             another symptom, the Cotton test requires only that the causal relationship
15           be a reasonable inference, not a medically proven phenomenon.

16  80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
    Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).
17

18         The Commissioner may, however, consider the nature of the symptoms alleged,

19  including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

20  947 F.2d at 345-47.  In weighing a claimant's statements and testimony, the Commissioner may

21  also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other

22  inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to

23  follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

24  (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

25  Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

26  claimant cooperated during physical examinations or provided conflicting statements concerning

27  drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

28  claimant testifies as to symptoms greater than would normally be produced by a given

10

1    impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

2    Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

3                 Regarding reliance on a claimant's daily activities to discount testimony of

4    disabling pain, the Social Security Act does not require that disability claimants be utterly

5    incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

6    repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

7    does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

8    Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

9    Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

10   claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

11   restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

12   claimant was entitled to benefits based on constant leg and back pain despite the claimant's

13   ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

14   activities are not easily transferable to what may be the more grueling environment of the

15   workplace, where it might be impossible to periodically rest or take medication").   Daily

16   activities must be such that they show that the claimant is ". . .able to spend a substantial part of

17   his day engaged in pursuits involving the performance of physical functions that are transferable

18   to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

19   before relying on daily activities to discount a claimant's pain testimony.  See Burch v. Barnhart,

20   400 F.3d 676, 681 (9th Cir. 2005).

21                 At Step 4, the ALJ considered Plaintiff's statements and testimony in determining

22   Plaintiff's residual functional capacity.  See CAR 21-24.  The ALJ summarized Plaintiff's

23   statements as testimony as follows:

24        The claimant noted in an April 2019 Function Report (Ex. 4E) that he
          a calcaneal fracture keeps him from working on his feet, as he can only
25        stand for about 20 minutes at a time and always uses a cane. He also
          reported that due to PTSD, he has issues relating to people because of his
26        uncontrollable rage. He stated that he lives alone; takes care of his dog;
          has no problems seeing to his personal care; prepares his own meals every
27        day; makes himself exercise once a day by walking 1 mile, resting and
          walking 1 more mile with his dog; and then he reads and is on the internet.
28        He noted that he does not drive; shops in stores for groceries weekly; and

                                                11

can count change. He reported that he does not spend time with others, but goes to therapy every 2 weeks. He stated that he does not finish what he starts and can read and understand written instructions just fine, but cannot handle stress or changes in routine.

The claimant more recently testified that he is single with no children; has been homeless since 2008 when he stopped working; can read, write and do simple math; and has been to jail a few times for misdemeanors. He reported that he spends his time thinking and contemplating his life; checking out dumpsters for food or recycling (3 -4 hours); charges his phone for 2 hours; and walks for an hour. He noted that he can fix meals; take care of his hygiene; do house chores such as mopping, sweeping, vacuuming, dishes, laundry and yard work (15-20 minutes); shops twice a week; and cares for his dog. He stated that he has a phone and checks his mail and whether his dad has called for 2 hours and has reconnected with his brothers and sisters by phone. He reported that he has a female friend who helps him and he goes to her house daily for 1 hour.

The claimant testified that he cannot work because of mental instability that became problem years ago. He noted that he has been diagnosed with PTSD and depression, but is working on it, sees a therapist, is on medication for mood stabilization, anxiety and depression and would like to go back to work. He reported that his therapist who he sees every 2 months and his dad help, but there is always the possibility of violence. He noted that he can lift 10-15 pounds; walk for 15 minutes at a time as surgical screws for his fracture make it too painful to walk; sit for 1 hour; bend; crouch; and reach and that he has no problems using his hands and fingers. He stated that he has not tried to find work and does not volunteer anywhere and is paranoid everyday as he has a fear of doing anything out of his comfort zone, as he feels unsafe as he could be hurt and gets anxious and worked up. He reported that he crosses the street if he sees someone and only goes to Grocery Outlet, as Walmart is too much.

CAR 21-22.

The ALJ concluded that Plaintiff's statements and testimony are "not entirely consistent with the medical evidence and other evidence in the record. . . ." Id. at 22.  The ALJ stated:

The claimant's statements about the intensity, persistence, and limiting effects of his symptoms are inconsistent. The undersigned notes that the claimant seems to exaggerate his symptoms and limitations, which are not supported by the medical evidence of record to the extent that he claims. Although the claimant experiences discomfort in his foot, he is able to walk and move about in a satisfactory manner. In addition, there are no indications of major muscle weakness or loss of control in his legs due to nerve damage. The claimant reported and testified that he walks 2 miles a day for exercise.

/ / /

/ / /

12

Similarly, the claimant may be affected by mental health issues at times, but the record shows that he is able to think, communicate and act in his own interest, adjust to ordinary emotional stresses and get along with others superficially, as well as to do his usual activities and remember and follow basic instructions. He leads an independent life; is able to care for himself and his dog; has a relationship with his father and siblings; and has a female friend who he sees on a daily basis.

The claimant slipped and fell when he was fishing in Oregon in May 2017 and experienced a non-displaced comminuted left calcaneus fracture. In June 2017, he underwent an open reduction and internal fixation procedure. Dr. Osborne reported that the claimant would be non-weight-bearing for a total of 10 weeks and that physical therapy would be initiated in 2 weeks (Ex. 1F/4).

The claimant had his first follow-up after surgery in January 2018 and noted that he was having trouble finding a job and wanted disability. In April 2018, the claimant reported left leg and low back pain, a gastric ulcer and depression with anxiety. A thoracic x-ray showed no evidence of scoliosis or abnormality. He was prescribed Tylenol, Ibuprofen and Prilosec, but declined medication for depression (Ex. 2F/33). In June 2018, Tylenol was continued for low back pain and Prilosec was also recommended. The claimant denied a history of depression. He was oriented x 3 and mood/affect were appropriate (Ex. 2F/28). In July 2018, the claimant reported neck pain and was offered physical therapy. (Ex. 2F/24).

The claimant reported acute left shoulder pain and left leg pain in April 2019. However, he had good range of shoulder motion and no local inflammatory signs. Left leg pain was noted to be residual from his previous surgery. Tylenol was prescribed and physical therapy was offered (Ex. 2F/3).

The claimant reported that his primary issues are related to PTSD and anxiety. Mental Status Examinations over the last few years identified hyperactive psychomotor behaviors (Ex. 2F/62), paranoia (Ex. 2F/14 & 3F/15, 18, 21), abnormal mood and/or affect (Ex. 2F/6, 9, 1, 15, 19 & 3F/7, 11, 15, 18, 21, 24, 32, 35, 39, 43, 45, 48, 57, 62, 65, 72, 75, 79, 81), poor impulse control (Ex. 2F/6, 9, 12, 19 & 3F/7, 18, 21), poor judgment (Ex. 3F/7, 15), abnormal thought processes (Ex. 3F/15, 18, 21, 24, 35, 43, 46, 58, 73, 76, 82) and pressured speech (Ex. 3F/throughout).

Diagnoses usually included recurrent episodes of mild major depressive disorder; moderate/severe PTSD with dissociative symptoms and derealization; and poorly controlled impulse control (Ex. 2F/6, 9, 12 & 3F/7, 11, 15, 18, 21, 24, 28, 32, 35, 39, 46, 49, 53, 58, 62, 66, 73, 76, 79, 82). The claimant had one PHQ-9 test, with a score of 26/27. He described a lack of stamina and motivation, feeling down or depressed without energy, sleeping 12 hours a day and little interest or pleasure in doing things nearly every day. He was without suicidal ideation or plans, but felt that it was not worth it to continue living (Ex. 2F/26).

/ / /

/ / /

13

The claimant noted in July 2018 that he was occasionally depressed, as he used to be able to walk 10 miles/day and now could only walk 3 miles/day due to ongoing pain. He reported that he had not worked since 2006 when his mom passed away and had been traveling for 7 years, visiting many states. Examination showed that memory was intact. Judgment was fair and insight was poor. Thought process and content were normal. He denied suicidal/homicidal ideation. Mild major depressive disorder was diagnosed and Zoloft was started. Global Assessment of Functioning (GAF) score was 60, which indicates mild-moderate symptoms. The claimant noted in September 2018 that Zoloft was helping, but he cannot work because he does not get along well with others. Examination was normal except for anxious mood and constricted affect. Insight and judgment were fair. GAF score was again 60. The claimant reported that he struggled with occasional regressive behavior throughout 2018 (Ex. 2F).

The claimant reported feeling calmer in January 2019. He was exercising and walking a lot. Sleep was good and mood was stable except he was anxious. He was being treated for mild recurrent major depressive disorder and PTSD in March 2019. He noted that Depakote had helped his anger issues, but he did not want to continue due to sedation, and wanted to manage his emotional difficulties with Zoloft. He noted no suicidal/homicidal ideation. He was oriented x4. There were some behavior regressions with poor impulse control, but speech was normal. Mood was euthymic, but affect was constricted. Memory was intact. The claimant was cooperative. Insight and judgement were fair. Thought content and process were normal (Ex. 2F/7).

The claimant has been living independently for years as a homeless individual. He currently lives in an isolated drainage pipe away from people, as he feels safer there (Ex. 3F/14, 20, 23, 31). Pre-Covid, the claimant was having difficulty getting to his appointments in the clinic and is very grateful now that telehealth appointments make[] it easier for him to get psychotherapy services (Ex. 3F/17).

The claimant's treatment plan identified that he is easily distracted; has poor short term memory recall; avoidant behaviors (Ex. 3F/76); anger issues (Ex. 2F/5, 11 & 3F/60, 78); and panic/phobic behaviors that are consistent, with an unreasonable fear/anxiety of specific situation/objects that impact somewhat on daily functioning (Ex. 3F/8, 76). However, in February 2020, the claimant noted significant improvement in depressive symptoms since starting sertraline and will continue as is. Impulsivity was still an issue, but he reported major improvement in mood stability, anger, and rage since starting Abilify. He now feels that he is able to function in society for the first time in many years, is considering going back to work and will continue as is. He was encouraged to continue therapy, particularly EMDR/brain spotting for PTSD (Ex. 3F/54).

The most recent records from August 2020 show that the claimant reported that he is "doing good". Anxiety and depressive symptoms have been minimal/manageable, mood overall is stable and he continues to meet with Ernesto weekly which the claimant stated helps quite a bit. The claimant reported that he gets through the night with minimal interruptions and is generally well rested. He reported that he is happy with his current psychiatric medication regimen and wishes to continue as is. Abilify was

continued for mood and mood stabilization, and sertraline as is for anxiety and depressive symptoms (Ex. 3F/12). The claimant was taking care of himself and his dog; was keeping up with the news on the internet; was in contact with family; and had a female friend who he visits daily at her home.

CAR 22-24.

Plaintiff argues that the ALJ erred in several ways. See ECF No. 14, pgs. 14-19. First, Plaintiff contends the ALJ improperly rejected Plaintiff's statements as to mental limitations by referencing Plaintiff's purportedly exaggerated physical symptoms. See id. at 14-15. Second, Plaintiff argues the ALJ cited no evidence in support of the conclusion that Plaintiff's daily activities are inconsistent with his testimony. See id. at 15-16. Third, Plaintiff asserts that the record does not support the ALJ's statement that Plaintiff's mental symptoms improved while Plaintiff was taking his prescribed medication. See id. at 17-18. Finally, Plaintiff argues that the ALJ's reference to "conservative treatment" was not specific to treatment for Plaintiff's physical or mental impairments and that the record does not indicate conservative treatment for the latter. See id. at 18-19.

### 1.   Exaggerated Symptoms

According to Plaintiff:

> . . . First, the ALJ found that Plaintiff seemed to exaggerate his symptoms and limitations (Tr. 22). To support this conclusion, the ALJ cites no evidence of malingering or exaggeration noted by Plaintiff's doctors or therapist (Tr. 22). In any event, the ALJ was referencing symptoms related to Plaintiff's *physical* impairment, and this was not a reason for discounting Plaintiff's allegations of mental dysfunction (Tr. 22).

ECF No. 14, pgs. 14-15.

The Court finds Plaintiff's argument well-taken. As Plaintiff notes, the ALJ cited no evidence in support of the conclusion that Plaintiff exaggerated symptoms.

### 2.   Daily Activities

Plaintiff contends:

> Contrary to the ALJ's finding that Plaintiff was able to act in his own interest and lead an independent life, the record showed that Plaintiff was homeless and living in a drainage pipe, where he isolated from other people (Tr. 425, 428, 431, 442). During therapy appointments, Mr. Cervantes regularly observed that Plaintiff appeared disheveled and had

1      poor hygiene (Tr. 443, 456, 459, 468, 476, 483, 486, 490, 492). Thus,
while Plaintiff might have been "independent" in so far as he was

2  homeless, the record does not support the ALJ's inference that Plaintiff
was successful in caring for himself (Tr. 22-23). Moreover, while Plaintiff

3  had a dog, it was a service animal providing emotional support, which
corroborated rather than detracted from Plaintiff's allegations of mental

4  dysfunction (Tr. 431, 483).

    With regard to the ALJ's suggestion that Plaintiff maintained good

5  relationships with his family, in fact, Plaintiff had not seen his father for
20 years prior to January 2019 (Tr. 368). Further, Plaintiff testified that he

6  spoke to his siblings on the phone but did not see them in person (Tr. 48),
and he reported to his psychiatrist that his family was not ready or willing

7  to help him get back up on his feet (Tr. 368). Further, Plaintiff's friend
reported that Plaintiff was estranged from most of his family (Tr. 255).

8  Additionally, while Plaintiff had *one* friend, this relationship did not
contradict his allegations of social dysfunction. The record documented

9  that Plaintiff was quick to anger and had altercations with police and
another homeless person (Tr. 371, 374, 431). Plaintiff also reported and

10  exhibited paranoid thought content during therapy appointments (Tr. 374-
375, 426, 429, 431-432). Such evidence contradicted the ALJ's general

11  assertion that Plaintiff got along superficially with others (Tr. 22-23).

12                                          * * *

13      [T]he ALJ asserted that Plaintiff's "daily activities" contradicted
his allegations of mental dysfunction (Tr. 25). The ALJ does not identify

14  what activities Plaintiff engaged in that were at odds with his reported
symptoms (Tr. 25). Indeed, Plaintiff described his day as waking up at

15  3pm and searching though dumpsters for food and recyclables (Tr. 44).
Otherwise, he charged his phone and checked the news (Tr. 55). Such

16  minimal activities in no way contradicted Plaintiff's allegations of mental
disability. *See Garrison*, 759 F.3d at 1016 ("We have repeatedly warned

17  that ALJs must be especially cautious in concluding that daily activities
are inconsistent with testimony […] because impairments that would

18  unquestionably preclude work and all the pressures of a workplace
environment will often be consistent with doing more than merely resting

19  in bed all day.") (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th
Cir.2012) ("The critical differences between activities of daily living and

20  activities in a full-time job are that a person has more flexibility in
scheduling the former than the latter, can get help from other persons ...,

21  and is not held to a minimum standard of performance, as she would be by
an employer. The failure to recognize these differences is a recurrent, and

22  deplorable, feature of opinions by administrative law judges in social
security disability cases.")).

23  ECF No. 14, pgs. 15-16.

24      The Court agrees with Plaintiff that the ALJ's reliance on daily activities to reject

25  Plaintiff's testimony is misplaced.  Here, the ALJ noted that Plaintiff has been living

26  independently for years as a homeless individual and that Plaintiff currently lives in an isolated

27  drainage pipe away from people, as he feels safer there.  The ALJ also observed that Plaintiff was

28  able to care for his dog, keep up with the news, and stay in contact with family.  These very

general activities of daily life, however, do not indicate an ability to perform consistently in full-

time competitive work. Plaintiff's own description of his daily activities shows quite limited

ability which the ALJ did not address.

3.    Improvement on Medication

Plaintiff asserts:

> Contrary to the ALJ's assertion, the record does not show that
> Plaintiff experienced significant improvement, even with regular use of
> medications. Although Plaintiff reported improvement to his anger with
> Depakote, this medication was ultimately discontinued in early 2019
> due to side effects of sedation (Tr. 365, 368). Additionally, although
> Plaintiff had difficulty obtaining his medications in June 2019 due to
> problems with his insurance coverage (Tr. 483, 486), and in March 2020,
> due to a disruption at the campsite where he was staying (Tr. 459), he
> otherwise appears to have been compliant with prescribed medications
> during the adjudicated period. Despite taking his medications, he
> nevertheless regularly exhibited a disheveled appearance, poor hygiene,
> anxious and depressed mood, distracted attention, abnormal thought
> process, and inconsistent/erratic memory (Tr. 435, 443, 446, 454, 457,
> 476-477, 483-484, 486-487). The most recent treatment notes recorded
> in July and August 2020 showed that Plaintiff exhibited pressured speech,
> anxious and depressed mood, erratic and inconsistent memory, distracted
> attention, poor impulse control, abnormal thought process, and paranoid
> thought content (Tr. 418, 426, 429, 432). Additionally, he exhibited poor
> concentration (Tr. 429), poor reasoning (Tr. 418, 429), and poor judgment
> (Tr. 418). Mr. Cervantes noted that, despite medications, Plaintiff
> continued to have great difficulty around other people, ongoing paranoia,
> and ongoing difficulty with attention and memory (Tr. 428, 431).
> Moreover, Plaintiff reported that, even with his medications, he still
> struggled with social anxiety, depression, and isolation (Tr. 486).
>     The foregoing treatment notes demonstrated that Plaintiff did not
> experience sustained or significant improvement to his mental condition.
> Although Plaintiff acknowledged that he received some benefit from his
> medications, that did not equate with an admission that his mental
> impairments were no longer disabling. *See Ghanim v. Colvin*, 763 F.3d
> 1154, 1162 (9th Cir. 2014) ("The fact that a person suffering from
> depression makes some improvement "does not mean that the person's
> impairment [ ] no longer seriously affect[s] [his] ability to function in a
> workplace.") (internal citation omitted). As the Ninth Circuit has
> emphasized, "it is error to reject a claimant's testimony merely because
> symptoms wax and wane […] Cycles of improvement and debilitating
> symptoms are a common occurrence, and in such circumstances it is error
> for an ALJ to pick out a few isolated instances of improvement over a
> period of months or years and to treat them as a basis for concluding a
> claimant is capable of working." *Garrison*, 759 F.3d at 1017-18. Though
> Plaintiff reported improvement to his mental symptoms during some
> treatment appointments, the therapy notes and mental status examinations
> clearly showed that he continued to experience significant mental

/ / /

17

1
2

dysfunction. As such, it was error for the ALJ to point out a few instances where Plaintiff reported improvement and use those to discount his allegations of mental disability (Tr. 24-25).

3

ECF No. 14, pgs. 17-18.

4

Plaintiff's argument is persuasive.  Here, the ALJ noted some improvement at

5

times, but also noted regression of symptoms at other times.  As such, the ALJ acknowledges that

6

Plaintiff's mental health symptoms wax and wane.  As the Ninth Circuit has noted, this type of

7

history is common with mental health issues and not a proper basis to discount a claimant's

8

testimony.  See Garrison, 759 F.3d at 1017-18.

9

4.     Conservative Treatment

10

According to Plaintiff:

11
12
13
14
15
16
17
18
19
20

Lastly, the ALJ discounted Plaintiff's symptom allegations because he received "conservative treatment" (Tr. 25). It is unclear whether the ALJ believed that Plaintiff's *mental* treatment was conservative, or if this was simply a reference to his *physical* treatment. To the extent the ALJ indicated that Plaintiff's mental treatment was conservative, the record does not support such a finding. Plaintiff regularly received treatment from a psychiatrist and therapist, and he was prescribed multiple psychotropic medications. Although Plaintiff was not psychiatrically hospitalized, the Ninth Circuit has held that "[h]ospitalization is not required to show that mental health conditions such as PTSD, OCD, and anxiety are disabling from employment." *Schiaffino v. Saul*, 799 Fed. Appx. 473, 476 (9th Cir. Jan. 9, 2020). Plaintiff submits that psychiatric treatment supplemented with psychotherapy was not "conservative" treatment undermining his allegations of mental dysfunction. Rather, such treatment was entirely consistent with a finding of mental disability. *See Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) ("Any evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated.").

21

ECF No. 14, pgs. 18-19.

22

The Court agrees.  Here, the ALJ passingly stated that Plaintiff's statements are

23

belied by conservative treatment.  See CAR 25.  The ALJ does not, however, indicate whether the

24

physical treatment or mental treatment was conservative.  Moreover, as to mental treatment, the

25

ALJ's own description of the record shows a significant treatment including various medications

26

over time and therapy.

27

/ / /

28

/ / /

18

1

**C.     Lay Witness Evidence**

2              In determining whether a claimant is disabled, an ALJ generally must consider lay

3    witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

4    919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

5    testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

6    evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

7    F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of

8    lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at 919.

9    When rejecting third party statements which are similar in nature to the statements of plaintiff, the

10   ALJ may cite the same reasons used by the ALJ in rejecting the plaintiff's statement.  See

11   Valentine v. Commissioner Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (approving

12   rejection of a third-party family member's testimony, which was similar to the claimant's, for the

13   same reasons given for rejection of the claimant's complaints).

14             On April 2, 2019, Plaintiff's friend, Laura Chambard, submitted a third-party

15   statement.  See CAR 250-57 (Exhibit 3E).  The Court accepts Plaintiff's description of this

16   statement as follows:

17              In a third-party function report, Plaintiff's friend, Laura Chambard,
         claimed that Plaintiff's PTSD, depression, and anger outbursts made it
18       difficult for him to work with others (Tr. 250). Further, Ms. Chambard
         reported that Plaintiff lived in a tent in the woods, he was estranged to
19       most of his family, he could only walk for 20 minutes before needing to
         rest for 2 hours, he could not sit long, he did not like talking to others, he
20       did not get along with most people, and he got irritated quickly (Tr. 252,
         255). Additionally, she reported that Plaintiff was not very good at
21       following written instructions, he got frustrated when following oral
         instructions and would go into a "rage," he did not get along with
22       authority figures well and attacked a police officer in September 2018, he
         did not handle changes in routine well, he handled stress very poorly, and
23       he got angry very quickly (Tr. 255-256).

24       ECF No. 14, pg. 22.

25             At Step 4, the ALJ mentioned Ms. Chambard's statement only in passing: "The

26   Third-Party Statement of the claimant's friend (Ex. 3E) has also been considered in adjudicating

27   this case."  CAR 25.  The ALJ, however, does not state whether the statement is accepted, or

28   rejected, and if rejected, why.  Given that the Court finds that a remand is appropriate to address

19

1    flaws in the ALJ's analysis of Plaintiff's statements and testimony, the Commissioner is

2    encouraged to give more than passing consideration of Ms. Chambard's statements, which appear

3    consistent with Plaintiff's own testimony.

4         **D.**     **Vocational Findings**

5        The Medical-Vocational Guidelines (Grids) provide a uniform conclusion about

6    disability for various combinations of age, education, previous work experience, and residual

7    functional capacity. The Grids allow the Commissioner to streamline the administrative process

8    and encourage uniform treatment of claims based on the number of jobs in the national economy

9    for any given category of residual functioning capacity. See Heckler v. Campbell, 461 U.S. 458,

10    460-62 (1983) (discussing creation and purpose of the Grids).

11        The Commissioner may apply the Grids in lieu of taking the testimony of a

12    vocational expert only when the Grids accurately and completely describe the claimant's abilities

13    and limitations. See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

14    Campbell, 461 U.S. 458, 462 n.5 (1983). Thus, the Commissioner generally may not rely on the

15    Grids if a claimant suffers from non-exertional limitations because the Grids are based on

16    exertional strength factors only. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If

17    a claimant has an impairment that limits his or her ability to work without directly affecting his

18    or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

19    the Grids." Penny v. Sulliacvan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

20    Subpart P, Appendix 2, § 200.00(d), (e)). The Commissioner may, however, rely on the Grids

21    even when a claimant has combined exertional and non-exertional limitations, if non-exertional

22    limitations do not impact the claimant's exertional capabilities. See Bates v. Sullivan, 894 F.2d

23    1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

24        In cases where the Grids are not fully applicable, the ALJ may meet his burden

25    under step five of the sequential analysis by propounding to a vocational expert hypothetical

26    questions based on medical assumptions, supported by substantial evidence, that reflect all the

27    plaintiff's limitations. See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). Specifically,

28    / / /

1   where the Medical-Vocational Guidelines are inapplicable because the plaintiff has sufficient

2   non-exertional limitations, the ALJ is required to obtain vocational expert testimony.  See

3   Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

4            Hypothetical questions posed to a vocational expert must set out all the substantial,

5   supported limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881

6   F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the

7   expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary

8   value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to

9   the expert a range of hypothetical questions based on alternate interpretations of the evidence, the

10  hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by

11  substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th

12  Cir. 1988).

13           At Step 5, the ALJ concluded that Plaintiff could perform his past relevant work

14  as a computer peripheral equipment operator.  See CAR 25-26.  The ALJ stated:

15       Michael Frank, an impartial vocational expert, testified as to the
         vocational aspects of this case. Upon review of the claimant's work
16       history in the file and after hearing the claimant's testimony concerning
         his past work, Mr. Frank testified that the claimant has past relevant work
17       experience as a fence erector (DOT # 869.684-022) which is a heavy,
         skilled (SVP 5) job; an informal waiter (DOT # 311.477-030) which is a
18       light (occasionally performed as medium), semi-skilled (SVP 3) job; a
         computer peripheral operator (DOT #213.382-010) which is a light
19       (performed as sedentary), semi-skilled (SVP 4) job; and a bartender (DOT
         # 312.474-010) which is a light, (performed as heavy), semi-skilled (SVP
20       3) job.

21       The undersigned instructed the expert to assume a hypothetical person
         with the same age and education as the claimant. The undersigned told the
22       expert to assume that such a person retains the residual functional capacity
         to perform medium work except he is able to lift/carry 50 pounds
23       occasionally and 25 pounds frequently; stand/walk for 4 hours in an 8-
         hour day; sit for 6 hours in an 8-hour day; and frequently climb, stoop,
24       kneel, crouch, and crawl, but he is unable to operate foot controls with his
         left foot. He is unable to perform any fast-paced work or intensely
25       concentrate for greater than 30 minutes without a 5-minute change in
         focus. He is limited to occasional interaction with coworkers and
26       supervisors and is to have no interaction with the public. He may be absent
         or off task 5% of the time due to foot pain and mental distractions.
27

28  / / /

The undersigned then asked if such a person could perform the past relevant work of the claimant as he performed it or as it is performed in the national economy. The expert testified that the person could perform the claimant's past relevant work as a computer peripheral operator as he performed it at the sedentary level.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform the job of computer peripheral operator as it is actually performed.

CAR 25-26.

As an alternative finding, the ALJ also concluded that Plaintiff can perform other jobs which exist in the national economy.  The ALJ found:

Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that he is also able to perform. Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

The claimant was born on May 1, 1977 and was 41 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963). The claimant has an 11th grade limited education (20 CFR 404.1564 and 416.964). Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

22

1
2
3
4
5
6

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and the aforementioned residual functional capacity.

7
8
9

> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as housekeeping cleaner (DOT # 323.687-014), a light, unskilled (SVP 2) job with an availability of 133,000 jobs in the US; marker (DOT # 209.587-034) a light, unskilled (SVP 2) job with an availability of 39,600 jobs in the US; and routing clerk (DOT # 222.687-022) a light, unskilled (SVP 2) job with an availability of 40,600 jobs in the US.

10
11

> CAR 26-27,

12      Plaintiff raises two arguments challenging the ALJ's vocational findings at Step 5.

13  First, Plaintiff contends that the ALJ erred in concluding that Plaintiff had performed his past

14  relevant work at the substantial gainful level.  Second, Plaintiff argues the ALJ failed to resolve

15  conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles

16  (DOT).  Because the ALJ made alternative findings at Step 5, concluding that Plaintiff can

17  perform his past relevant work as well as other jobs which exist in the national economy, any

18  error with respect to past relevant work is harmless.  The Court therefor focuses the remainder of

19  the analysis on Plaintiff's second argument regarding the DOT.

20      For Social Security benefits hearings, the DOT is the default presumption for

21  disability classifications.  See Massachi v. Astrue (9th Cir. 2007) 486 F.3d 1149, 1150.

22  Moreover, the ALJ has an affirmative responsibility to ask about any possible conflict between

23  vocational expert evidence and information provided in the DOT.  See id.  The ALJ may,

24  however, rebut the presumption of applicability of the DOT when expert testimony exists that is

25  supported by persuasive evidence contradicting the DOT. See Murry v. Apfel, 1999 U.S. App.

26  LEXIS 28911, 1, 9 (9th Cir. 1999) (holding that the Administrative Law Judge is not bound by

27  the DOT descriptions but can instead rely on the testimony of the vocational expert and own

28  findings specific to the individual plaintiff before the Administrative Law Judge); see also Tackett

1    v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999) (holding that the ALJ can rely on vocational

2    expert's testimony as to (1) the jobs a claimant can work in given the limitations and residual

3    functional capacity and (2) the availability of these jobs on a national scale); Moncada v. Chater,

4    60 F.3d 521, 524 (9th Cir. 1995) (concluding that vocational experts have the authority to testify

5    whether a particular plaintiff would be able to perform specific jobs within DOT

6    subcategories); Distasio v. Shalala, 47 F.3d 348, 350 (9th Cir. 1995); Barker v. Secretary of

7    Health and Human Svcs., 882 F.2d 1474, 1478 n.1 (9th Cir. 1989) (holding that a plaintiff

8    restricted to sedentary work is not automatically barred from performing all "light" jobs when

9    plaintiff was still capable of performing a subcategory of "light" jobs); Terry v. Sullivan, 903

10   F.2d 1273, 1277 (9th Cir. 1990).

11                  Regarding potential conflicts with the DOT, the ALJ stated:

12               The vocational expert testified that while his testimony was not
                 inconsistent with the Dictionary of Occupational Titles (DOT), the
13               limitation in the residual functional capacity as to time off task is not
                 directly addressed by the DOT.  In regard to any item not directly
14               addressed by the DOT, the vocational expert testified that he relied upon
                 his work experience of 40 years in job placement.  The undersigned
15               accepted the vocational expert's testimony in regard to all vocational
                 issues.
16
                 CAR 26-27.
17

18                  Here, the Court finds that the ALJ properly relied on the vocational expert's

19   testimony to resolve any possible inconsistencies with the definitions contained in the DOT.

20   Specifically, the ALJ acknowledged possible inconsistencies and asked the vocational expert to

21   address the, which he did by providing testimony based on his knowledge and experience.

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

24

1

## IV.  CONCLUSION

2          For the foregoing reasons, this matter will be remanded under sentence four of 42

3   U.S.C. § 405(g) for further development of the record and/or further findings addressing the

4   deficiencies noted above.

5          Accordingly, IT IS HEREBY ORDERED that:

6          1.      Plaintiff's motion for summary judgment, ECF No. 14, is granted;

7          2.      Defendant's motion for summary judgment, ECF No. 15, is denied;

8          3.      The Commissioner's final decision is reversed and this matter is remanded

9   for further proceedings consistent with this order; and

10         4.      The Clerk of the Court is directed to enter judgment and close this file.

11

12   Dated:  December 23, 2022

13                                             _____
                                               DENNIS M. COTA
14                                             UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28